UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| ONEISHA HARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| IT'S ALL GOOD AUTO SALES, INC., | ) | NO. |
| MARK GOODFELLOW, individually, and | ) | JURY DEMAND |
| d/b/a IT'S ALL GOOD AUTO SALES, | ) | |
| INC., AND KATONYA JACKSON, | ) | |
| individually, and as an agent for IT'S ALL | ) | |
| GOOD AUTO SALES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

_____

**COMPLAINT**
_____

COMES NOW Plaintiff, Oneisha Harvey, by and through undersigned counsel, and in support of her claim for relief against Defendants It's All Good Auto Sales, Inc., Mark Goodfellow, individually and d/b/a It's All Good Auto Sales, Inc., and Katonya Jackson, individually and as an agent for It's All Good Auto Sales, Inc., states the following:

**I. NATURE OF THE CASE**

1.      This is an action for damages, arising under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.  Additionally, the action includes claims under the Tennessee Consumer Protection Act, and the Tennessee Uniform Commercial Code, as well as fraud, negligent misrepresentation, breach of contract and conspiracy to commit some or all of the aforementioned claims.  All aforementioned acts

constitute predatory lending and sales practices and a predatory lending and sales scheme by Defendants.

2.    Defendants form an enterprise in a fraudulent scheme to sell low quality over priced used vehicles to poor and working class African-American residents of Memphis, and from nearby cities and nearby states, through false and misleading advertising, and intentionally misleading acts and omissions in sales and service.

3.    Defendants take advantage of the buyer's desperate financial position to impose very unfavorable lending terms, and require that the buyer put down most or all of their savings to purchase an old and typically unreliable vehicle. Also, Defendants require an additional deferred payment to further burden the buyer. Defendants' scheme is intended to ultimately deprive buyers of their vehicle so that Defendants can resell it from their lot, at the highest down payment possible, and repeat the process over and over again.

## II. JURISDICTION

4.    This Action is brought pursuant to the provisions of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., 18 U.S.C. § 1964, et seq, and TILA, 15 U.S.C. § 1601 et seq. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, with resulting jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

## III. VENUE

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that Plaintiff and Defendants reside or do business in this district and/or a substantial part, if not all, of the events or omissions giving rise to the claim occurred in this district. Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) in that all parties reside, are found, have an

agent, and/or transact his/her/its affairs in this district.

## IV. PARTIES

6.   Plaintiff Oneisha Harvey (hereinafter referred to as "Plaintiff" or "Harvey") is an adult citizen and a resident of Shelby County, Tennessee, and currently resides at 4493 Quail Ridge Trail, Memphis, Tennessee 38141.

7.   Defendant It's All Good Auto Sales, Inc. (hereinafter "IAG") is a for-profit company, formed and currently operating in Shelby County, Tennessee, in the business of selling used cars to the public.  The principal place of business of IAG is 2944 South Third St., Memphis, TN 38109.  The registered agent for IAG is Mark T. Goodfellow, 2944 S. Third St., Memphis, TN 38109.

8.   Defendant Mark Goodfellow (hereinafter referred to as "Goodfellow") is a resident and citizen of Shelby County Tennessee.  Upon information and belief, he is the founder, owner, and principal shareholder of IAG and actively controls the day to day operations of the business.

9.   Defendant Katonya Jackson (hereinafter referred to as "Jackson"), is a resident and citizen of Shelby County Tennessee.  Upon information and belief, Jackson manages the day-to-day operations of IAG, and specifically is in charge of the finances and business records.

## V. JURY DEMAND

10.  Plaintiff invokes her right to trial by jury as provided for in 42 U.S.C. § 1981a(c)(1) and Rule 38 of the Federal Rules of Civil Procedure.

## VI. STATEMENT OF FACTS

11.   Harvey is a 20 year old African-American woman who is a resident of Shelby County,

Tennessee.  Harvey first learned of IAG through television ads and billboards located

throughout the City of Memphis.  In choosing to do business with IAG, Harvey relied

heavily upon IAG's advertising motto in advertising.  This motto is found in the

commercial television, radio, and billboard ads and on the IAG company website, as

follows:  "At It's All Good Auto Sales, we don't care about your credit, we care about

you!  If you can provide proof of residence and a down payment, you can drive home in

the ride of you[r] dreams today!" This motto can be found at

http://itsallgoodauto.net/Financing.html.  The picture shows a simple signature on the

contract and a stamp of approval.  The key message is no customer is turned down.

12.   Harvey purchased a 2004 Chevy Cavalier from IAG in March of 2011.  She paid $2090

as a cash down payment for that vehicle.

13.   On or about October 3, 2011, Harvey traded her 2004 Chevy Cavalier at IAG and paid an

additional $2000 down for a 2002 Nissan Altima from IAG.  At the time of the trade, she

was current on her notes on the 2004 Chevy Cavalier.  Harvey was accompanied on

October 3, 2011, by Devean Hoyle (hereinafter referred to as "Hoyle").

14.   There was no price tag or buyer's guide on the 2002 Nissan Altima, but Harvey was told

she needed to make a large down payment to close the deal on the second car.

15.   Goodfellow met Harvey and Hoyle and assured them the 2002 Nissan Altima was in

good running condition.  Goodfellow said he drove the 2002 Nissan Altima himself from

the State of Missouri without any problems.  Based upon that statement, Harvey signed

the contract and the remaining documents with Jackson and paid $2000 in cash.

4

16.    During the signing of the contract, Jackson did not explain what the quick pays are for.
Harvey inquired why the interest rate remained the same at 26% when she had been
paying on time with the prior contract.  Jackson responded that was their standard rate.
Jackson directed her only to sign the contract.  After signing the contract and leaving the
business office, the salesman (first name Steve) stated to Harvey that the car needed an
oil change.

17.    Two days later on October 5, 2011, Harvey took the 2002 Nissan Altima to Valvoline for
an oil change.   Harvey heard the car making clicking noises even after the oil change.
Harvey took the car to Advanced Muffler on October 7, 2011, and a diagnostic was
performed.  Advanced Muffler told Harvey the car needed a new motor.  Harvey left
Advanced Muffler and proceeded to take the car back to IAG.  However, the car caught
on fire on Interstate 240 near the Lamar Exit.  Harvey paid $75 to have the car towed
back to IAG for inspection the same day.

18.    Shortly thereafter, Goodfellow claimed that Valvoline was at fault and negligent in
changing the oil.  However, Valvoline had videotaped the oil change and held a viewing
which was attended by Harvey, Hoyle, Steve, the IAG sales consultant, and the manager
at Valvoline, Bobby Watkins.  The video showed a normal oil change with no problem or
discrepancies.  After the viewing, Goodfellow admitted liability on or about October 17,
2011, and said "It's not on them … It's on us."

19.    Goodfellow offered to allow Harvey to pick another car but insisted that she needed
another $2500 down payment.  Harvey told Goodfellow she didn't have the funds and
inquired why she had to pay more money when the previous car only lasted four days and
needed a new motor.  Harvey insisted she get a refund on her down payment.  In

response, Goodfellow gave Harvey the trade-in back and promised to work out a deal later. Harvey was told by Goodfellow she was not required to make payments in that the car was a loaner until the matter was resolved.  However, a few weeks later and without notice Goodfellow repossessed the 2004 Chevrolet Cavalier.  Harvey had paid over $6000 in cash over a six month period to IAG between the purchases of the two vehicles and was left by Defendants with no vehicle to show for it.

20.    At the time of the sale Harvey worked part-time but is no longer able to do so without transportation.

## VII. CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1961 et seq.**

21.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that all Defendants engaged in a predatory lending and sales scheme and in an organized effort to sell low quality over priced used vehicles to poor and working class African American residents of Memphis and cities in nearby states through false and misleading advertising, and intentionally misleading acts and omissions in sales and service. Defendants take advantage of the buyer's desperate financial position to impose very unfavorable lending terms, and require that the buyer put down most or all of their savings to purchase an old and typically unreliable vehicle.

22.    Defendants' scheme is intended to ultimately deprive buyers of their vehicle so that Defendants' can resell it from their lot, at the highest down payment possible, and repeat the process again. All Defendants used wire, radio, or television communication in interstate or foreign commerce, as well as writings, signs, signals pictures, or sounds in

furtherance of their actions as set forth above, and all Defendants engaged in a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961-1968.

23. Defendants, all of which are persons within the meaning of RICO, are employed by or associated with an enterprise whose activities engage in or affect interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); to wit, multiple violations of 18 U.S.C. § 1343.

24. The members of the group have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics and are not isolated events.

25. All Defendants violated 18 U.S.C. § 1343 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice, by implementation of their RICO scheme through their business enterprise of selling used cars.

26. The multiple violations of 18 U.S.C. §1343 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral parts of and essential to the success of the Predatory Lending and Sales Scheme.  In this instance, the Predatory Lending and Sales Scheme targeted poor and working class African American consumers.

27. All Defendants knew the Predatory Lending and Sales Scheme could not have succeeded and/or continued without the use of extensive advertisements through wire, internet,

radio, television, and pictures in interstate or foreign commerce for the purpose of

transmitting misleading and fraudulent information to prospective customers such as

Plaintiff.

28.    The facts demonstrate that Defendants formed an association-in-fact.

29.    The associated persons formed an ongoing organization, formal or informal, concerning

the RICO Enterprise, the various associates functioned as a continuing unit of the RICO

Enterprise, and the RICO Enterprise exists separate and apart from the predicate activities

themselves.  The facts in the case demonstrate the existence of an association-in-fact

RICO Enterprise by showing that the enterprise has a certain amount of organizational

structure or some sort of chain of command.

30.    Defendants IAG and Goodfellow have an ongoing and continuing RICO enterprise, and

fraudulent and predatory scheme as illustrated in a pending federal case filed by Valerie

Moore on or about September 2011, and in a prior federal lawsuit filed by Demetria Neal

on or about October 2011, via its used car business.

31.    Defendant Goodfellow is the principal agent and individual owner of IAG and he and the

business entity IAG are at the heart of the RICO Enterprise. Goodfellow is the architect

and facilitator and a crucial component to the success of the enterprise. The scheme

begins with television, radio and internet advertising for IAG that is targeted at the poor

and working class African Americans who live in Memphis, West Memphis, and other

nearby cities in Tennessee, Arkansas and Mississippi.  Although advertisements are used

year around, advertisement is intensified at the beginning of the year, at the time most of

the targeted customers get their tax refunds.  The core of the scheme is to capitalize

during tax season and collect substantial down payments which approximate the actual fair market value of the cars.

32. Defendant Jackson is the assistant manager at IAG and her duties include custodian over the financial records, business manager and authorized signer of contracts for auto sales, and executing deals for IAG self-financing which is commonly referred to as "tote-the-note." Jackson is also in charge of the business bank accounts for IAG, writing checks, making deposits, data entry, and in charge of financial statements.

33. When the customers arrive at IAG, they are greeted by a salesperson. The cars in the front of the lot are usually a used sports or luxury car. These vehicles are intended to get the interest of the customer. These vehicles have prices posted on them, which are generally outside the price range of most customers.

34. The first thing that the salesman asks the customer is either how much cash the customer has in his or her pocket, or how much of a down payment can he or she make that day. The salesman then brings the customer further back in the lot to a vast selection of low quality used cars. The cars have an inventory number painted on the front wind shield, but do not have a price listed on them, nor do the cars have the necessary Buyer's Guide or any other paperwork posted on the window.

35. Once the customer picks out a car, the salesman may or may not allow the customer to test drive the car. The salesman will then tell the customer that he or she must make a substantial down payment in a certain amount. Whether or not the customer and salesman agree on a down payment, the salesperson will direct the customer to a building on the IAG property where the car is financed. The salesman will then hand over the customer to a person in the business office to finance the vehicle or complete the paperwork.

Jackson is the assistant manager and finance person and signed the retail installment contract as an agent for IAG.

36. The finance person often quotes a down payment for the car that is different, and higher, than the amount the customer believed he or she had negotiated with the salesman.  If the customer and the finance person agree on a down payment, the customer will be asked to fill out a sheet of paper with some basic information, then the customer will be presented with a pre-filled out sales contract.  The finance person will then use one of several techniques to distract the customer from the high interest rate, actual down payment, total price, and the Truth in Lending boxes in general.

37. The finance person, in this instance Jackson, draws the customer's attention to the due date for the payments, without explaining the quick pays.  Because the vehicle is often financed with multiple "quick pays," there are several sets of installment payments, which are often less than a month from the date of purchase.  This is designed to ensure that the customer will default and the car subject to repossession.

38. After the customer signs the paperwork, and hands over all of his or her cash, the customer believes that he or she has a reliable car, and the RICO Enterprise of IAG, Goodfellow, Jackson, the salesperson, as well as other agents of IAG, have already made a profit on the old, poor quality vehicle sold to the customer.  The customer has also been setup for the second part of the scheme.  Having already spent all the money that he or she has, for the car upfront, the customer is likely to have difficulty making the first payment or subsequent payments for the remainder of the deferred payment.  If the customer misses that payment, or any payment, a tow truck is quickly sent to repossess the vehicle.  Because the customer cannot afford to redeem the vehicle, the RICO

10

Enterprise will get the vehicle back quickly, so that it can turn it around and restart the process and recycle the vehicle back into the market.

39.    If the customer does manage to make payments on the car, the trap is sprung when the car inevitably breaks down.  The customer cannot afford to make payments on the car and repair it at the same time, so he or she either asks IAG to repair it, or misses a payment trying to get the car to run.  Either way, the RICO Enterprise is for Defendants to get the car back, so that it can be sold again, regardless of its mechanical condition.  The same ten to fifteen year old car could be sold and re-sold every month of the year, raking in significant profits for the RICO Enterprise.

40.    By reason of the aforesaid violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), Defendants are liable to Plaintiff for actual and treble damages, as well as for costs and attorney's fees.

<u>**COUNT II**</u>

**VIOLATIONS OF THE TRUTH IN LENDING ACT**

41.    The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that all Defendants have violated the provisions of Truth-In-Lending Act, 15 U.S.C. § 1601, <u>et</u> <u>seq.</u>, and Regulation Z which implements the Truth-In-Lending Act, 12 C.F.R. § 226, <u>et</u> <u>seq.</u> (TILA):

    a.    By failing to make required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 226.17(a). Defendants misdirected Plaintiff's attention away from the mandatory TIL disclosures.

    b.    By failing to disclose the correct APR on the sales contract in violation of 15 U.S.C. § 1606 (c) and Regulation Z § 226.22 (a)(2).  The APR disclosed on the

sales contract is 26.000%.  However, using a payment calculator, the APR comes out to 27.961%.  The difference is more than the 1/8 of one percent (.125%) allowed by the statute.  Further, the difference is a purposeful understatement by Defendants, not a good faith mathematical error by Defendant.

42.    By reason of the aforesaid violations of the Act and Regulation Z, Defendants are liable to Plaintiff in the amount of twice the finance charge, actual damages to be established at trial, and attorney's fees and costs in accordance with 15 U.S.C. § 1640.

## COUNT III

### FRAUD

43.    The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that all Defendants engaged in a fraudulent scheme to sell low quality over priced used vehicles to poor and working class African American residents of Memphis in cities in nearby states through false and misleading advertising, and intentionally misleading acts and omissions in sales and service.

44.    The above-described acts of Defendants constitute intentional misrepresentations by the Defendants of material facts, including, but not limited to the following:

a.    Defendants' television, radio and internet ads featuring Mr. Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You;"

b.    The lack of a Buyer's Guide (per FTC Used Car Rule, 16 CFR Part 455) or any pricing information on most if not all vehicles on the lot, including the car the Plaintiff purchased;

c.    The Defendants' misdirection of Plaintiff's attention away from the necessary disclosures;

    d.   Defendants' false claim regarding the purported value of the vehicle;

    e.   Defendants' promise that the vehicle was in "good running condition."

45.    Defendants made the above-described misrepresentations with full knowledge of their falsity, without belief in their truth, or with reckless disregard of the truth.

46.    Plaintiff reasonably relied on the above-described misrepresentations of material facts by Defendants.

47.    Plaintiff suffered damages, great mental anguish, and emotional distress as a result of the above-described misrepresentations of material facts by Defendants.

48.    Defendants are liable for actual, compensatory, and punitive damages.

## COUNT IV

**VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT, AS AMENDED**

49.    The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that Defendants violated the Tennessee Consumer Protection Act by engaging in unfair and deceptive acts and practices in the course of selling a car to the Plaintiff.

50.    IAG is a "person" as defined by the Tennessee Consumer Protection Act, T.C.A. §47-18-103(9).

51.    Goodfellow is a "person" as defined by the Tennessee Consumer Protection Act, T.C.A. §47-18-103(9).

52.    Jackson is a "person" as defined by the Tennessee Consumer Protection Act, T.C.A. §47-18-103(9).

53.    Defendants violated the Tennessee Consumer Protection Act, T.C.A. §47-18-101 et seq. (hereinafter referred to as"TCPA") by engaging in the representations and omissions described in the above paragraphs of this Complaint.  These representations and

omissions constitute unfair and/or deceptive acts and/or practices which affect trade or commerce within Tennessee in violation of the TCPA, T.C.A. §47-18-104(b), and include but are not limited to:

    a.  Defendants' television, radio and internet ads featuring Mr. Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You;"

    b.  The lack of a Buyer's Guide (per FTC Used Car Rule, 16 CFR Part 455) or any pricing information on most if not all vehicles on the lot, including the car the Plaintiff purchased;

    c.  The Defendants' misdirection of Plaintiff's attention away from the necessary disclosures;

    d.  Defendants' false claim regarding the purported value of the vehicle;

    e.  Defendants' promise that the vehicle was in "good running condition."

54.    These representations and omissions constitute unfair and/or deceptive acts and/or practices which affect trade or commerce within Tennessee in violation of the TCPA, T.C.A. § 47-18-104(b).

55.    As a result of all Defendants' violation of the TCPA, they are liable to Plaintiff for all actual damages, as well as attorney's fees and costs pursuant to TCPA, T.C.A. § 47-18-109(e)(1).

56.    In addition, to the extent any and all Defendants' violations were intentional (as opposed to merely negligent), the actual damages to Plaintiff should be trebled pursuant to the TCPA, T.C.A. § 47-18-109(a)(3).

## COUNT V

## NEGLIGENT MISREPRESENTATION

57.    The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and

alleges that all Defendants made negligent misrepresentations to Plaintiff in the course of

selling the car, including but not limited to:

    a.    Defendants' television, radio and internet ads featuring Mark Goodfellow's

trademarked phrase, "I Don't Care About Your Credit. I Care About You;"

    b.    The lack of a Buyer's Guide (per FTC Used Car Rule, 16 CFR Part 455) or any

pricing information on most if not all vehicles on the lot, including the car the

Plaintiff purchased;

    c.    The Defendants' misdirection of Plaintiff's attention away from the necessary

disclosures;

    d.    Defendants' false claim regarding the purported value of the vehicle;

    e.    Defendants' promise that the vehicle was in "good running condition."

58.    Defendants did not exercise reasonable care in obtaining or communicating the above-

described false information to Plaintiff.

59.    Plaintiff justifiably relied on the above-described false information supplied by

Defendants.

60.    Plaintiff suffered damages as a result of the above-described false information by

Defendants.

61.    Defendants are liable for actual and compensatory damages.

## COUNT VI

**VIOLATION OF THE TENNESSEE UNIFORM COMMERCIAL CODE**

Breach of Implied Warranties of Fitness and/or Merchantability

62. The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that Defendants breached the implied warranties of fitness and/or merchantability in the sale of the car to Plaintiff, entitling Plaintiff to reject and/or revoke her purchase of the car.

63. A warranty that the Plaintiff's car was fit for the particular purposes of transporting the Plaintiff to and from her place of employment and other necessary errands in Memphis and that it was merchantable was implied by law in this cause, pursuant to T.C.A. § 47-2-315.

64. Plaintiff put Defendants on notice within four days after purchasing the 2002 Nissan Altima that it was having mechanical problems, and asked Defendants to repair the vehicle or refund her money.  Goodfellow led Plaintiff to believe a deal could be worked out or return her down payment.  Goodfellow did not make good on the promise.

65. Because the car Defendant sold to Plaintiff could not fulfill the implied purposes, Defendants were in breach of the warranties of fitness for the particular purposes and/or merchantability.

66. As a result, Plaintiff is entitled to recover actual and consequential damages.

## COUNT VII

**BREACH OF CONTRACT**

67. Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that Defendants had a contractual relationship with the Plaintiff, either directly or

implicitly; Defendants, either directly or through agents, breached such contracts with

Plaintiff; and that the breaching of such contracts by Defendants was the proximate cause

of damages suffered by Plaintiff.

68.    As a result, Plaintiff is entitled to recover actual and consequential damages.

**WHEREFORE**, Plaintiff respectfully prays that this Court:

1.    Assume Jurisdiction of this case;

2.    Empanel a jury to hear the issues in this case pursuant to Rule 38 of the Federal Rules of

Civil Procedure and 42 U.S.C.§ 1981a (c)(1);

3.    Award to Plaintiff actual and treble damages to be established at trial pursuant to

Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c);

4.    Award to Plaintiff costs and attorney fees pursuant to RICO, 18 U.S.C. § 1964(c);

5.     Award to Plaintiff statutory damages in the amount of twice the finance charge in

accordance with 15 U.S.C. § 1640(a)(2);

6.    Award to Plaintiff attorney's fees and costs in accordance with 15 U.S.C. § 1640.

7.    Award to Plaintiff actual, compensatory, and punitive damages to be established at trial

for fraud;

8.    Award to Plaintiff actual and treble damages to be established at trial for violation of the

Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, et seq., as amended.

9.    Award to Plaintiff costs and reasonable attorney fees pursuant to Tennessee Consumer

Protection Act, Tenn. Code Ann. § 47-18-109(e)(1);

10.    Award to Plaintiff actual and compensatory damages to be established at trial for

negligent misrepresentation;

11.    Award to Plaintiff damages for violations of the Tennessee Uniform Commercial Code,

for an amount to be proven at trial;

12.    Award to Plaintiff damages for breach of contract for an amount to be proven at trial;

13.    Enter judgment against Defendants for compensatory damages in an amount to be proven at trial;

14.    Award to Plaintiff its costs and expenses incurred in this matter;

15.    Award to Plaintiff such other relief to which Plaintiff is entitled and that is deemed appropriate by the Court.

Dated:    September 25, 2012.

Respectfully submitted,

*s/* Bruce Harris
Bruce Harris, BPR # 19022
Frank Cantrell, BPR# 6661
Attorney for Plaintiff
Memphis Area Legal Services, Inc.
109 North Main, Ste. 200
Memphis, TN 38103
(901) 523-8822

18